IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

WILLIE J. CANTRELL,

       Plaintiff,

v.

JOHN WESTERMAN, *et al.*,

       Defendant.

§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No. 6:23-CV-00055-H-BU

## FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
## OF THE UNITED STATES MAGISTRATE JUDGE

Plaintiff WILLIE J. CANTRELL brings this action against Defendants John Westerman, Matthew Walts, Tom Green County Sheriff's Department (TGCSD) Detective Gary Cole, the Texas Department of Public Safety (DPS), the Texas Highway Patrol, and the TGCSD (collectively, "the Defendants"), alleging that they violated his constitutional rights. Cantrell's claims are subject to judicial screening under 28 U.S.C. § 1915 because he has been granted leave to proceed *in forma pauperis* (IFP). Dkt. No. 13. For the reasons below, the undersigned RECOMMENDS that Cantrell's claims be DISMISSED with prejudice as time-barred and for failure to state a claim.

## I. JURISDICTION

Cantrell brings his claims under 42 U.S.C. § 1983, providing the Court with subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3). Dkt. No. 1. Venue is proper in the Northern District of Texas, San Angelo Division, because Cantrell's claims arise from his

1

arrest and detention in Tom Green County, Texas. 28 U.S.C. § 1391(b)(2). The under-signed has the authority to enter these Findings, Conclusions, and Recommendations after the case was automatically referred to the undesigned for preliminary screening pursuant to Special Order 3-251. Dkt. No. 8; 28 U.S.C. § 636(b)(1). Cantrell has not consented to the undersigned exercising the full jurisdiction of this Court.

## II. FACTUAL BACKGROUND

For purposes of screening a plaintiff's complaint under 28 U.S.C. §§ 1915(e)(2)(B) or 1915A, a court must accept well-pleaded factual allegations as true and construe them in a way that most favor the plaintiff. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017). A court may look to the plaintiff's allegations in their complaint, responses to a questionnaire, authenticated prison or jail records, and testimony provided at a *Spears* hearing. *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999); *see also Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may consider authenticated medical and prison records).

### A. Arrest

Cantrell's claims originate from a traffic stop that occurred on May 2, 2020. Dkt. No. 18 at 2. Cantrell was driving from Christoval to San Angelo when he was pulled over by Trooper Westerman for driving eight miles per hour above the speed limit. Dkt. Nos. 1 at 3; 18 at 2. During the stop, Westerman made disparaging and insulting remarks about Cantrell, demanding to know what gave Cantrell "the right to be speeding." *Id.* Westerman also questioned where he was going and why he was traveling during covid-19, before then requesting Cantrell's driver's license and proof of insurance. Dkt. No. 24 at 6. When

2

Cantrell explained that his car insurance was stored on his phone, Westerman asked Cantrell to exit the vehicle and called a K-9 unit to the scene. Dkt. Nos. 18 at 7; 24 at 7. The call was placed around ten minutes into the stop, and fifteen minutes later Walts arrived with the K-9. Dkt. Nos. 1 at 3; 24 at 1.

Walts rounded the vehicle with the K-9, then told Cantrell that they needed to conduct a further search inside the vehicle. Dkt. No. 18 at 3, 10. Cantrell alleges that the officers lied about the K-9 detecting an odor. *Id.* Nonetheless, the officers searched inside his vehicle; Westerman commented to the officers that they would "find something to charge [him] with." *Id.* at 12. Cantrell did not consent to the search. *Id.* at 3, 10.

Inside, the officers found an empty CBD vape pen, along with packaging in the center console confirming that the pen contained CBD. Dkt. Nos. 18 at 4; 24 at 10. The officers also found various prop items used for Cantrell's music group, PLANTATIONS; these items included an empty gas can, matches, paper towels, a hammer, a box cutter, and six empty bottles.[1] Dkt. Nos. 1 at 3; 18 at 4. Lasty, the officers found personal items, including Cantrell's wallet and cellphone, a phone charger, black skinny jeans, a black hoodie, and tan boots. *Id.* Most of these items were found packed neatly inside a black duffle bag. Dkt. No. 24 at 7.

After completing the search, the officers made comments about "riot materials" and "George Floyd." Dkt. No. 18 at 12. They arranged the items on the hood of Cantrell's car,

---

[1] The bottles were "prop molotov cocktails," each labeled with a large "P" in the font used by PLANTATIONS. Dkt. Nos. 1 at 3; 24 at 8. The authenticated police report also notes that the paper towels were stuffed into the necks of the glass bottles.

and Westerman took photographs of the items for evidence. *Id.* at 4. The officers then returned all of the items, except for Cantrell's phone, to the car. *Id.* at 5. Westerman then placed Cantrell under arrest for possession of the CBD vape pen, claiming that it was a controlled substance. *Id.* at 8.

After arresting Cantrell and while still on the scene, Westerman performed a search of Cantrell's phone. Dkt. No. 18 at 7. Westerman did not have a warrant, and Cantrell did not consent to this search. Dkt. Nos. 18 at 6–7; 24 at 11. Westerman was able to access the contents of Cantrell's phone because it was not locked with a password. Dkt. No. 24 at 11. Westerman found MP3 music files and videos of the items they had found, along with various notes, text files, emails, and pictures. Dkt. No. 18 at 7. Westerman added a charge for unlawful use of criminal instruments—the alleged criminal instruments included the empty gas can, empty glass bottles, paper napkins, and black hoodie and jeans. Dkt. Nos. 1 at 3; 18 at 7. Cantrell was also charged for driving more than ten percent above the posted speed limit.[2] Dkt. No. 1 at 3.

Cantrell was then taken to Tom Green County Jail; Westerman retained possession of Cantrell's phone as evidence, and Cantrell's car was towed and impounded at Home Motors. Dkt. No. 1 at 3. Cantrell remained in jail overnight before posting bail on May 3, 2020. *Id.* at 4. After his release, Cantrell recovered his car from Home Motors; he found that his vehicle "appeared to have been ransacked," with his belongings scattered

---

[2] Cantrell alleges that the officers lacked probable cause for the criminal instruments and controlled substances charges, Dkt. No. 18 at 10–11, but concedes that he was driving more than ten percent above the speed limit when pulled over. *Id.* at 1–2.

throughout the vehicle. *Id.* Cantrell alleges that the defendants "scattered and planted items of accused criminal nature" in the vehicle because they were not properly re-packaged in his duffle bag. Dkt. Nos. 1 at 4–5; 18 at 5; 24 at 14.

On or around May 12, 2020, Detective Cole downloaded and searched the contents of Cantrell's phone's. Dkt. No. 21 at 19. Cantrell did not recover his phone until June 10, 2020, more than a month after his May 2 arrest. Dkt. No. 1 at 5. Cantrell met with Westerman at a TDPS field office; while there, Westerman attempted to interrogate Cantrell. *Id.* When Cantrell refused to answer questions, Westerman made malicious remarks about Cantrell's upbringing in foster care before finally releasing the phone to him. *Id.*

### B. Detention

Cantrell also brings claims arising from three periods of pre-trial detention at Tom Green County Jail (TGCJ). The first detention (the 2020 Detention) occurred on May 2, 2020, the day of Cantrell's initial arrest. Dkt. No. 1 at 4. When Cantrell was detained, the magistrate set his bond at $15,000.00.[3] *Id.* Cantrell was held overnight before posting bail and being released. *Id.* His second detention (the 2021 Detention) began on February 24, 2021, when he was rebooked for his criminal instruments charge following his extradition from Grand Junction, Colorado.[4] Dkt. Nos. 1 at 5; 18 at 15–16. A second bond was set for $7,500; Cantrell posted bail on March 15, 2021, and was released. Dkt. No. 1 at 6. His third

---

[3] Half of this bond was for his controlled substance charge, and the other half was for his criminal instruments charge. Dkt. No. 1 at 4.

[4] Cantrell was arrested in Colorado for trespassing at Colorado Mesa University. Dkt. No. 21 at 12. He was strip-searched at the airport before boarding the flight to Texas. Dkt. No. 1 at 6. The officers supervising him denied him access to the bathroom until they had landed. Dkt. No. 18 at 14. As a result, he urinated himself during the flight; the supervising officers did not notice until the plane landed, and he was then taken to a restroom. Dkt. Nos. 1 at 6; 18 at 15.

and final detention (the 2022 Detention) began on December 30, 2021, following his arrest in Austin, Texas on December 23 and subsequent rebooking in TGCJ. *Id.* at 7. Cantrell was refused bond by the magistrate and remained at TGCJ until his trial. *Id.*

When initially booked for each detention, Cantrell was forced to sleep on the floor. Dkt. No. 19 at 1. In all, he was kept on the floor for six hours at the start of the 2020 Detention, twenty-four hours at the start of the 2021 Detention, and twenty-four hours at the start of the 2022 Detention. *Id.* Cantrell was told that he had to wait for a dorm to become available, or that he was required to sleep on the floor for Covid-19 quarantine. *Id.* at 2. However, he was provided bedding halfway through the first and third booking. Dkt. *Id.* Sleeping on the floor caused him sore joints and sore muscles, and exposed him to a "cold climate." *Id.* The floor during his third detention was also rat-infested; he observed rats every twenty-four hours by the cell doors and in the hallways. Dkt. Nos. 1 at 7; 19 at 2. TDCJ did nothing except tell him to keep his cell clean. Dkt. No. 19 at 3. Cantrell suffered from nausea and loss of appetite as a result of the rats. *Id.*

Cantrell was also subjected to repeated work-related strip searches during his 2021 and 2022 Detentions. While detained at TDCJ, Cantrell was assigned to work on kitchen duty. Dkt. No. 18 at 17. Before each work assignment, Cantrell was subjected to a thirty to sixty second strip search conducted by unnamed male officers. *Id.* at 18. Cantrell was also subjected to some random strip searches. *Id.* at 17. In all, Cantrell was searched more than thirty times; no contraband was ever found during these searches. *Id.* at 17–18.

Cantrell was also exposed to sickness during his detentions. Cantrell was exposed to Covid-19, HIV, Hepatitis B, and the common cold. Dkt. No. 1 at 4, 6–7. He suffered

symptoms including coughing, sneezing, itchy eyes, runny nose, sore throat, headaches, drowsiness, stomach pains, nausea, and hair loss. Dkt. No. 18 at 19. He contracted these symptoms twice; once in March 2021, and once in January 2022. Dkt. No. 18 at 20. He received only pills and cough drops as treatment, and neither were effective. *Id.* at 22.

Cantrell was also exposed to inmate violence during his 2021 and 2022 Detentions. During his 2021 Detention, he was housed in a dormitory with West Texas gang members. Dkt. No. 19 at 4. The gang members pressured Cantrell to do various tasks for them, including cleaning for them, washing their clothes, or giving them food from his tray. *Id.* Cantrell refused; sometime in February 2021 they retaliated by surrounding him and pushing him around in an attempt to start a fight. *Id.* Prison officers intervened, calling for backup and moving Cantrell to a different unit. *Id.* at 5–6.

When Cantrell was rebooked for his 2022 Detention, he notified the officers about the prior incident with the West Texas gang and requested placement in a different cell block. Dkt. No. 19 at 6. Instead, the officer booking him placed him in the same dormitory as before, stating that the gang members most likely were not there anymore. Dkt. No. 19 at 6. However, there were still West Texas gang members present, and Cantrell was involved in a second fight in February 2022. Dkt. No. 19 at 4. Officers again intervened, moving him to a different unit. Dkt. No. 19 at 5–6. Cantrell was not injured during either altercation with the West Texas gang. Dkt. No. 19 at 5.

Lastly, Cantrell was forced to perform unpaid labor during his detentions. He was assigned cleaning duties to keep cells sanitary during the pandemic, including sweeping, mopping, and scrubbing jail cells. Dkt. No. 1 at 4, 6–7. During his 2021 Detention, he was

also assigned to dorm and kitchen duties for eight hour shifts each day. Dkt. Nos. 1 at 6; 19 at 7. This work was assigned when he was moved to a different unit following his altercations with the West Texas gang members; he was told that the only other available unit was the Quarantine unit. Dkt. No. 19 at 7–8. The forced labor caused Cantrell to suffer from back cramps and pain in his joints and muscles. *Id.*

### C. Prosecution

Before Cantrell went to trial, the speeding and possession charges were dismissed; Cantrell was tried only for the unlawful use of criminal instruments. Dkt. Nos. 1 at 7; 18 at 9. On February 18, 2022, two weeks before trial, the assistant district attorney enhanced the criminal instruments charge from a state jail felony to a third degree felony; this increased the maximum sentence from two years to ten years. Dkt. Nos. 18 at 16–17; 24 at 19. The charge was enhanced to reflect the prosecution's new argument at trial that the prop items were used for "arson." Dkt. No. 24 at 16.

Cantrell's trial lasted two days, from April 18 to April 19, 2022. Dkt. No. 24 at 16. During the trial, the prosecution presented three witnesses: Officer Walts, Detective Cole, and Jamie Cantrell, the plaintiff's uncle. *Id.* at 13. On cross examination, Walts was questioned about the uncollected prop items. *Id.* He answered by referencing "riots" and "George Floyd." *Id.* This was despite George Floyd's death occurring on May 25, 2020, weeks after Cantrell was first arrested. *Id.* Walts also admitted to not collecting Cantrell's prop items as evidence. *Id.*

Because none of the prop items from Cantrell's car were retained for evidence, the only other evidence the prosecution could provide was from Cantrell's phone. *Id.* at 12.

Said evidence included images of Cantrell with the prop items in a party scene, a video of the same party scene, and notes from his phone relating to personal family disputes. *Id.* at 14–15. The defense also used evidence from Cantrell's phone, including videos of his music group performing with the prop items. *Id.* at 15.

Cantrell alleges that the defendants failed to disclose exonerating information prior to the trial. *Id.* at 16. Specifically, he alleges that district attorney Allison Palmer omitted information collected by the state's investigation that indicated Cantrell was sexually abused while in the foster care system. *Id.* at 16–17. The concealed information included Westerman's June 2020 conversation with Cantrell—in which Westerman admitted to contacting Cantrell's foster family—and Westerman's conversations with the foster family. *Id.*

On April 19, 2022, the jury found Cantrell not guilty of his criminal instruments charge. *Id.* at 17. Rather than being immediately released, Cantrell was handcuffed and taken back to TGCJ for an additional three hours before being released from jail. *Id.* at 18–19. Cantrell alleges that each of his detentions at TGCJ caused emotional distress, pain and suffering, mental anguish, exposure to disease, and damage to his professional accounting and physical health. Dkt. No. 1 at 9.

### III.  THE PARTIES

Cantrell brings his constitutional claims against the following defendants: (1) Trooper John Westerman, (2) DPS Officer Matthew Walts, (3) TGCSD Detective Gary Cole, (4) the Texas DPS, (5) the Texas Highway Patrol, and (6) TGCSD. Dkt. No. 1 at 2. Each defendant is sued individually and in his official capacity. *Id.* Cantrell alleges that these defendants violated his rights under various constitutional amendments, including the

Fourth, Fifth, Eighth, Thirteenth, and Fourteenth amendments. Dkt. No. 24 at 18. Before discussing the sufficiency of Cantrell's pleadings, the undersigned first evaluates whether the proper defendants have been named in Cantrell's civil action.

It is well settled that a plaintiff may not bring a civil rights action against a servient political agency or department unless such agency or department enjoys a separate and distinct legal existence. *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313–14 (5th Cir. 1991). This Court has routinely held that this class of "non-jural entities" includes county jails. *See, e.g.*, *Lindley v. Bowles*, No. 3:02-CV-595-P, 2002 WL 1315466, at *2 (N.D. Tex. June 12, 2002) (finding Dallas County Jail is not a proper defendant with a jural existence); *Rambo v. Valdez*, No. 3:16-CV-002-O, 2016 WL 4398969, at *2 (N.D. Tex. May 6, 2016) (finding Dallas County Sheriff's Office is a non-legal entity). The undersigned concludes that the Tom Green County Sheriff's Department is a non-jural entity, and Cantrell's claims cannot proceed against it. Instead, the undersigned construes these claims as being brought against Tom Green County Sheriff J. Nick Hanna in his official capacity. **The Clerk is directed to conform the docket to reflect this change.**

Next, Cantrell's claims against the state of Texas are barred by Eleventh Amendment sovereign immunity. The State of Texas is shielded from suits brought against it in federal court by the Eleventh Amendment. *Cox v. Texas*, 354 F. App'x 901, 902 (5th Cir. 2009). This immunity extends to state agencies and state officials sued in their official capacity.[5]

---

[5] Counties do not enjoy Eleventh Amendment sovereign immunity. *Russell v. Jones*, 49 F.4th 507, 512–13 (5th Cir. 2022) (sovereign immunity does not apply to counties and county officials). Thus, Cantrell's construed claims against Tom Green County and its officials are not barred.

*Moore v. Louisiana Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). The Texas Department of Public Safety and Texas Highway Patrol are Texas agencies; Cantrell cannot sue them—or sue Westerman and Walts in their official capacities—unless sovereign immunity has been waived.

Here, no waiver of immunity applies. Section 1983 does not abrogate Texas's Eleventh Amendment immunity. *Moore*, 743 F.3d at 963. Thus, neither TDPS nor THP has waived its sovereign immunity. Cantrell also cannot rely on the *Ex parte Young* exception to sue Westerman and Walts in their official capacities, as the exception applies only when the plaintiff seeks prospective relief for ongoing violations of federal law. *Ex parte Young*, 209 U.S. 123 (1908). Cantrell does not seek prospective relief,[6] and the allegedly unlawful searches, arrests, detentions, and prosecution raise only *past* violations of his rights. *James v. Hegar*, 86 F.4th 1076, 1082–83 (5th Cir. 2023) (holding that allegations solely of past harm do not constitute ongoing violations under *Ex parte Young)*. Because sovereign immunity has not been waived, Cantrell cannot sue the TDPS or the THP. Cantrell also cannot sue Westerman or Walts in their official capacities, but may sue them in their individual capacities. **The Clerk is directed to conform the docket to reflect this change.**

Lastly, the undersigned notes that Cantrell raises claims that are properly asserted against defendants not named in his Complaint. Where these unnamed defendants are implicated solely by events occurring outside of this Court's jurisdiction, it is improper to join

---

[6] He requests that Westerman and Walts "immediately and permanently restrain all racial profiling and criminal contempt" against him, but does not allege that they have continued to profile him. Dkt. No. 1 at 19.

said defendants to this civil action. These includes Cantrell's claims arising from: (1) his arrest and detention in Grand Junction, Colorado; (2) his extradition from Colorado to Texas; and (3) his arrest and detention in Austin, Texas. Dkt. No. 1 at 5–7. The Court lacks jurisdiction over the claims brought against the police officers and jail officials identified in these allegations, and will not examine the plausibility of these claims.

Cantrell also asserts claims against unnamed defendants based on events occurring within this district. Cantrell alleges that the state engaged in malicious prosecution and *Brady* violations when prosecuting him. Dkt. No. 24 at 16–17. The proper defendant for such claims is the prosecutor, not the arresting officers or the county. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (noting that the *prosecution* has a duty to disclose material exculpatory evidence). Here, Cantrell identifies District Attorney (DA) Allison Palmer as the prosecutor. Dkt. No. 24 at 16–17. **The Clerk is directed to conform the docket to add District Attorney Allison Palmer as a defendant.**

In short, the undersigned liberally construes Cantrell's pleadings as raising the following claims: (1) Fourth and Fourteenth Amendment claims arising from Cantrell's arrest against Westerman and Walts in their individual capacities; (2) Fifth Amendment claims arising from the search and seizure of Cantrell's phone against Detective Cole and Sheriff Hanna; (3) Fifth, Eighth, and Thirteenth Amendment claims arising from Cantrell's pretrial detention against Sheriff Hanna; and (4) Fourth and Fifth Amendment claims and *Brady* claims arising from Cantrell's prosecution against Westerman, Walts, DA Palmer, and Sheriff Hanna.

12

## IV.  LEGAL STANDARDS

A court must dismiss a complaint filed *in forma pauperis* if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B).

A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly, it lacks an arguable basis in law if it contains indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

Dismissal for failure to state a claim—whether under Section 1915(e)(2)(B)(ii), or Rule 12(b)(6)—"turns on the sufficiency of the 'factual allegations' in the complaint." *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)). Thus, if a plaintiff "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief, the claims should not be dismissed merely because the plaintiff fails to articulate the proper legal theory that otherwise makes those facts actionable in court. *Johnson*, 574 U.S. at 11–12 (citing Fed. R. Civ. P. 8(a)(2)–(3), (d)(1), (e)).

Courts accept *well-pleaded* factual allegations as true. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). This means the factual allegations, while not required to be detailed, must amount to more than mere labels, conclusions, or a statement

of the legal elements of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Chhim*, 836 F.3d at 469.

For claims to be substantively plausible, a plaintiff need not establish that the pleaded facts probably occurred as alleged, but the facts must allow the court "to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678–679). Even pro se plaintiffs must plead facts that raise the right to relief above a speculative level. *Chhim*, 836 F.3d at 469 (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)). And when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When evaluating a complaint under these standards, courts liberally construe the pleadings of pro se plaintiffs, holding their complaints to "less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But "liberal construction does not require that the Court . . . create causes of action where there are none." *Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013). "To demand otherwise would require the 'courts to explore exhaustively all potential claims of a *pro se* plaintiff'" and would "'transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.'" *Jones v. Mangrum*, No. 3:16-cv-3137, 2017 WL 712755, at *1 (M.D. Tenn. Feb. 23, 2017) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief'

14

is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

## V. ANALYSIS

Many of Cantrell's claims arise from events that occurred in early 2020 and throughout 2021. Because his Complaint was filed in 2023, it is necessary to address whether the statute of limitations bars Cantrell's claims. The undersigned will then screen any remaining claims chronologically, starting with the claims arising from his arrest, then turning to the claims arising from his pretrial detainment, and concluding with the claims arising from his prosecution.

### A. Statute of Limitations

Cantrell brings his claims under § 1983, which does not include a statute of limitations. 42 U.S.C. § 1983. Instead, the Supreme Court determined that the general statute of limitations of the forum state for personal injuries governs § 1983 claims. *Owens v. Okure*, 488 U.S. 235, 239 (1989). In Texas, a plaintiff has two years from the time his claims accrue to file a personal injury claim, including a claim filed under § 1983. *Balle v. Nueces Cty., Texas,* 952 F.3d 552, 556 (5th Cir. 2017) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a)).

Federal courts also apply the forum state's equitable tolling principles. *Wallace v. Kato*, 549 U.S. 384, 394 (2007) And equitable tolling is sparingly applied by Texas courts. *Myers v. Nash*, 464 F. App'x 348, 349 (5th Cir. 2012) (per curiam). To be entitled to equitable tolling under Texas law, a plaintiff must demonstrate that he "actively pursued his

15

judicial remedies but filed a defective pleading during the statutory period" or "was induced or tricked by his adversary's misconduct into allowing filing deadlines to pass." *Bailey v. Gardner*, 154 S.W.3d 917, 920 (Tex. App. – Dallas 2005).

However, the accrual of a plaintiff's claims is a question of Federal law, not state law. *Nottingham v. Richardson*, 499 F.App'x 368, 375 (5th Cir. 2012); *see also Wallace v. Kato*, 549 U.S. 384 (2007) (holding that while the forum state's statute of limitations are used in a § 1983 claim, federal law governs when the cause of action accrues). "Under federal law, the [limitations] period begins to run 'the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.'" *Russell v. Bd. of Trustees,* 968 F.2d 489, 493 (5th Cir.1992) (quoting *Helton v. Clements,* 832 F.2d 332, 335 (5th Cir.1987)).

A plaintiff is aware of an injury once he gains "possession of two critical facts: (1) an injury has occurred; and (2) the identity of the person who inflicted the injury." *Stewart v. Par. of Jefferson,* 951 F.2d 681, 684 (5th Cir.) *cert. denied,* 506 U.S. 820 (1992). This standard is satisfied through either actual or constructive knowledge; the plaintiff is aware of an injury if he has "facts which, in the exercise of due diligence, would have led to actual knowledge." *Vigman v. Community Nat'l Bank & Trust Co.*, 635 F.2d 455, 459 (5th Cir. 1981). Likewise, a plaintiff need not realize that a legal cause of action exists, so long as he knows of facts that would lead a reasonable person to either conclude that the defendant's actions produced his injury or, at minimum, seek professional advice leading to the same conclusion. *Harrison v. United States,* 708 F.2d 1023, 1027 (5th Cir.1983); *see also Turner v. Johnson*, 177 F.3d 390, 391–92 (5th Cir. 1999) (noting that ignorance of the law

and illiteracy are not grounds for equitable tolling (citing *Barrow v. New Orleans S.S. Ass'n*, 932 F.2d 473, 478 (5th Cir.1991))).

Here, Cantrell filed his Complaint on September 8, 2023. Dkt. No. 1. Under Texas' two-year statute of limitations, any claims that accrued prior to September 8, 2021, are barred by the statute of limitations unless equitable tolling applies. Thus, the claims arising from the following events fall outside the limitations period and are potentially barred: (1) the traffic stop, search, and arrest on May 2, 2020; (2) the search of his phone on May 12, 2020; (3) the 2020 Detention, which ended on May 3, 2020; and (4) the 2021 Detention, which ended on March 15, 2021. Dkt. No. 1 at 1–6. Because Cantrell was present for each of these events, it is implausible that he was not immediately aware of facts permitting a reasonable inference that his constitutional rights were presently being violated. It is likewise implausible that Cantrell did not know of the relevant defendants—Westerman, Walts, Cole, and the Green County Sheriff's Department—who were responsible for the conduct or policies that caused his injury. Because Cantrell had enough facts to infer that a violation occurred and which defendants were responsible, his claims accrued at or near the time the events occurred. The claims therefore accrued outside the limitations period and are barred.

The undersigned finds it implausible that equitable tolling applies to any of Cantrell's untimely claims. Cantrell does not allege that he filed a defective complaint prior to this case, nor does he claim that the defendants sought to prevent him from filing a timely claim either through force or deceit. The facts further indicate that Cantrell was free on bond from May 3 to November 5, 2020, and from March 15 to December 23, 2021. Dkt. No. 1 at 4–7. During these periods, the defendants had no control over Cantrell, and a

timely claim could have been filed during either interval. Thus, none of these claims are equitably tolled; each of them are barred by the statute of limitations.

Conversely, claims that arose after September 8, 2021, are not barred by the statute of limitations. This includes claims arising from the 2022 Detention, which began on December 30, 2021, and his prosecution, which accrued upon his acquittal on April 19, 2022.[7] Dkt. No. 1 at 7–8. Thus, only the following claims are analyzed below: (1) claims arising from Cantrell's 2022 Detention, including his Fourth Amendment search claims, Eighth Amendment conditions claims, Eighth Amendment excessive bail claim, and Thirteenth Amendment involuntary servitude claim; and (2) claims arising from Cantrell's prosecution, including his *Brady* violation claim, Malicious Prosecution claim, Fifth Amendment Takings Clause claim, and Fifth Amendment double jeopardy claim. All other claims are barred by the statute of limitations.

## B. Claims Arising from 2022 Detention

Cantrell's first series of claims arise from allegations that the defendants violated his constitutional rights during his 2022 Detention at TGCJ. He claims that he was subjected to unconstitutional conditions of confinement in violation of the Fourteenth Amendment when he was forced to sleep on the floor during initial booking, exposed to various diseases while detained, and put at risk of inmate violence. He also claims that he was

---

[7] Although Cantrell's prosecution claims may implicate events that occurred prior to September 8, 2023, accrual for these claims requires either acquittal or conviction for the underlying offense. *See United States v. Bagley,* 473 U.S. 667, 678 (1985) (*Brady* claim requires finding that suppression of evidence "undermines confidence in the *outcome* of trial" (emphasis added)); *Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023) (malicious prosecution claim requires favorable termination of prosecution against plaintiff); *Currier v. Virginia*, 585 U.S. 493, 498 (2018) (double jeopardy shields against second prosecution for same offense).

subjected to unreasonable strip searches in violation of the Fifth Amendment. In addition, he claims that the bail set by the magistrate was excessive under the Eighth Amendment. Lastly, he claims that he was pressed into involuntary servitude in violation of the Thirteenth Amendment when forced to perform kitchen and cell duty as a pretrial detainee.

### 1. *Condition of Confinement Claims*

First, Cantrell alleges that he was subjected to constitutionally inadequate conditions of confinement. While convicted inmates are protected by the Eighth Amendment's prohibition on cruel and unusual punishment, pretrial detainees are protected by the due process guarantees of the Fourteenth Amendment. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996). Pretrial detainees may bring Fourteenth Amendment claims under two alternative theories: (1) an episodic-act-or-omission claim or (2) a condition-of-confinement claim. *Hare*, 74 F.3d at 644–45; *see also Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009).

A condition-of-confinement claim alleges that a general condition of confinement within a jail operates as an unconstitutional pattern or policy. *See Shepard*, 591 F.3d at 452. In "true jail condition cases," the policy or practice that allows the condition to exist is presumptive evidence of subjective intent on the part of the state or the officials who implement it. *Hare*, 74 F.3d at 644. Thus, the official's state of mind is not in question. The inquiry instead focuses on whether the detainee can establish: (1) a rule, policy, or sufficiently pervasive pattern or practice, (2) that was not reasonably related to a legitimate governmental objective, and (3) that caused a violation of the detainee's constitutional rights. *Duvall v. Dallas County, Texas*, 631 F.3d 203, 207 (5th Cir. 2011).

Conditions of confinement, "alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities." *Id.* But this applies only when the conditions have a "mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise[.]" *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Examples provided by the Supreme Court include a cold cell combined with a failure to provide blankets, or denial of outdoor exercise combined with confinement to small cells for almost twenty-four hours a day. *Id.* at 304–05. The duration of confinement is also a relevant factor. "A filthy, overcrowded cell ... might be tolerable for a few days and intolerably cruel for weeks or months." *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) (quoting *Hutto v. Finney,* 437 U.S. 678, 686–87 (1978), *abrogated on other grounds by Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42 (2024)).

Here, Cantrell alleges claims based on two conditions of confinement—the conditions in the holding cell during initial booking, and the presence of sickness in TGCJ. Because these claims do not involve misconduct by specific jail officials, they are properly characterized as conditions-of-confinement claims. He also alleges an episodic act or omission based on the prison violence he experienced.

### i. *Holding Cell Conditions*

The first condition Cantrell complains of is the holding cell he was kept in during initial booking. When Cantrell was booked at TGCJ on December 30, 2021, he was kept in a cell without any bedding. Dkt. No. 19 at 1. Cantrell was forced to sleep on the floor in what he described as a "cold climate," and also saw rats near the door of his cell. *Id.* at 1–2. This initial booking lasted for twenty-four hours before he was moved to another cell;

however, he was provided bedding after twelve hours. *Id.* at 1.

Here, Cantrell fails to allege a constitutionally inadequate condition. Regardless of whether the conditions were related to a legitimate government interest or arose as part of a pervasive practice or pattern, none of these conditions in isolation amounted to a constitutional violation. *Young v. McCain*, 760 F. App'x 251, 256–577 (5th Cir. 2019) (no violation when housed without bedding); *Waller La. v. Ward*, 2016 WL 7235832, at *3 (W.D. La. Oct. 19, 2016) (no violation from "the mere presence of pests"). Neither did these conditions violate Cantrell's rights in combination, because they did not deprive him of a "single, identifiable human need[.]" *Wilson*, 501 U.S. at 304. For comparison, the Fifth Circuit determined that conditions were constitutionally inadequate when a prisoner was kept in an "extremely cold" cell for fifteen days and "forced to sleep on the floor where rats crawled over him." *Foulds v. Corley*, 833 F.2d 52, 53–54 (5th Cir. 1987). But in this case, Cantrell's treatment was less severe in every way: he was exposed only to a "cold climate" rather than extreme cold, was housed for at most one day rather than *Foulds'* fifteen days, merely saw rats on occasion rather than have them crawling over him, and was provided bedding for the latter twelve hours of his stay in the booking cell. Dkt. No. 19 at 1–3. Given the lack of severity or duration of the conditions, the undersigned does not find it plausible that Cantrell was deprived of a single human need such as sleep or warmth.

### ii. Exposure to Disease

The second condition Cantrell complains of is the exposure to disease in the jail. Neither "isolated examples of illness" nor the mere "incidence of diseases or infections" in prison imply unconstitutional conditions, as "any densely populated residence may be

subject to outbreaks." *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 454 (5th Cir. 2009). Instead, a plaintiff must demonstrate the existence of "serious, extensive and extended" violations to allege a plausible claim. *Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 208 (5th Cir. 2011) (finding that conditions were unconstitutional when jail had "bizarrely high" MRSA infection rate of two hundred per month for three years, compared to two a month at other jails).

Here, Cantrell fails to plausibly allege a constitutional violation because his claim rests solely on the general presence of diseases in jail and his own symptoms. He describes exposure to Covid-19, HIV, Hepatitis B, and the common cold. Dkt. No. 1 at 4, 6–7. He also notes that he twice suffered various symptoms, including coughing and sneezing, itchy eyes, a runny nose and a sore throat, among others. Dkt. No. 18 at 19–20. Cantrell's isolated examples of illness and the unsurprising claim that the densely populated jail contains diseases fail to state a claim under the Fourteenth Amendment.

Cantrell also takes issue with TGCJ's health policies; in particular, he blames polices related to covid-19 quarantine and mask mandates. Dkt. No. 18 at 21. Cantrell also alleges that TGCJ and the Sheriff's Department should have issued PR bonds for inmates with minor charges. *Id.* The undersigned is unpersuaded by either argument. Cantrell does not explain how the policies in place caused his injury or in what way they were defective. Cantrell also does not allege that the policies were improperly enforced—on the contrary, he clarifies that he does not claim his illness was caused by the "acts or omissions of TGCJ officials." *Id.* at 21. And even assuming that low-level offenders should be released to reduce exposure to disease, Cantrell had at this point been arrested three times, and was denied bond entirely by the magistrate. Dkt. No. 1 at 7.

Regardless, inadequate quarantine enforcement or draconian bond policies are only relevant if they result in an exposure to a serious risk of substantial harm—as discussed, the exposure to illness described above falls short of this standard. The undersigned therefore finds it implausible that the presence of disease in the jail was sufficiently pervasive to violate Cantrell's rights.[8]

### iii. Inmate Violence

Third, Cantrell alleges a claim based on his exposure to risk of harm from the West Texas Gang. Here, Cantrell concedes that the jail officials did not know about the risk of harm before the initial attack. Dkt. No. 19 at 5. Instead, he argues that when he was re-booked in December 2021, he informed an unnamed TGCJ official of the prior attacks, but that said official ignored his request. *Id.* at 5–6. Because Cantrell does not presume TGCJ's intent to incarcerate him in the face of a known condition, but instead that a particular jail official failed to "tend to [his] basic human needs," this claim is properly characterized as an episodic act or omission claim rather than a condition of confinement claim.[9] *Hare*, 74 F.3d at 644–45.

Prison officials have a constitutional duty to protect prisoners from violence from other inmates. *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006) (citing *Farmer v.*

---

[8] The undersigned also notes that these facts do not raise a claim based on deliberate indifference to serious medical needs. Cantrell only notes that the treatment he was provided was ineffective, which is insufficient to allege deliberate indifference. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997) ("Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs.").

[9] If construed as a conditions claim, Cantrell still fails to state a plausible claim because he does not allege that a rule, policy, or pervasive pattern existed. Cantrell makes no allegations about rules or policies that exposed him to harm from the West Texas gang members. Furthermore, he describes only two incidents where an altercation occurred, which is insufficient to meet the "heavy burden" of proving a pervasive pattern. Dkt. No. 19 at 4; *Shepherd v. Dallas County*, 591 f.3d 445, 452 (5th Cir. 2009).

*Brennan,* 511 U.S. 825, 832–33 (1994)). To bring an episodic claim based on inmate violence, a plaintiff must demonstrate that the defendant was aware of the risk of violence faced by the plaintiff and disregarded it. *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003) ("Prison officials are not, however, expected to prevent all inmate-on-inmate violence . . . [and] can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm."). To demonstrate deliberate indifference, the plaintiff must show that the defendant was (1) aware of facts permitting inference of risk, (2) subjectively drew that inference, and (3) disregarded the risk. *Spikes v. Wheat*, 141 F.4th 662, 668 (5th Cir. 2025) (citing *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (quotation marks, citation, and alterations omitted)).

Here, Cantrell fails to plausibly allege that TGCJ officials deliberately disregarded the risk of inmate violence. Even assuming that Cantrell's notice to the officer about the February 2021 altercation provided sufficient facts to infer a risk of serious harm existed, Dkt. No. 19 at 5–6, he does not allege that the officer subjectively drew that inference and disregarded it. Instead, he alleges that the TGCJ officials *should* have been aware of the risk after he informed them. *Id.* at 5. An official's failure to perceive a substantial risk that he should have is "no cause for commendation," but nonetheless cannot be considered deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). The officer's response—that the gang members most likely were not in the dorm anymore—further supports a finding that the officer acted with negligence rather than deliberate indifference. Dkt. No. 19 at 6; *Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence." (citing *Estelle*, 429 U.S. at 104 (1976))). The

undersigned therefore finds it implausible that TGCJ allowed a sufficiently pervasive pattern of officials disregarding a substantial risk of inmate-on-inmate violence.

In summary, Cantrell fails to allege a plausible conditions-of-confinement claim arising from his detention in the booking cell or his exposure to disease at TGCJ. Cantrell also fails to plausibly allege an episodic act or omission arising from his exposure to inmate violence. Each of these claims should be dismissed.

### 2. Strip Search Claim

Next, Cantrell alleges that he was subjected to unreasonable strip searches while detained at TGCJ. A prisoner retains his Fourth Amendment rights in prison, although those rights are "diminished by the needs and exigencies of the institution in which he is incarcerated." *Elliott v. Lynn*, 38 F.3d 188, 190–91 (5th Cir. 1994). Searches and seizures of prisoners must be "reasonable under all the facts and circumstances in which they are performed." *Id.* at 191 (quoting *United States v. Lilly*, 576 F.2d 1240, 1244 (5th Cir. 1978)). The burden of proving reasonableness is a light one, and prison administrators are given "great deference from the courts." *Id.*

When balancing the "need for the particular search against the invasion of the prisoner's personal rights[,]" courts consider the "scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir. 1999) (first citing *Elliott,* 38 F.3d at 191; then quoting *Bell v. Wolfish,* 441 U.S. 520, 559 (1979)). The Fifth Circuit has interpreted this standard as favoring "deference to prison authorities' views of institutional safety requirements," even while acknowledging that inmates have a legitimate claim to

"not be searched in a humiliating and degrading manner." *Elliott*, 38 F.3d at 191 (quoting *Watt v. City of Richardson Police Dep't.,* 849 F.2d 195, 196 (5th Cir.1988)).

Here, the undersigned finds it implausible that the searches Cantrell describes were unreasonable. The searches involved only exposing his "genitals" and "butt cheeks" to inspecting officers; he does not allege that any cavity searches were performed. Dkt. No 18 at 17. The searches were less than one minute each, and always performed by a male officer. *Id.* at 17–18. While Cantrell was searched upwards of thirty times, most of these searches were performed just before his kitchen duty shift. Dkt. No. 18 at 17–18. Common sense dictates that prison officials ought to perform a search for contraband before allowing detainees to prepare food for other detainees. While some of the searches were random, *Id.* at 17, the Supreme Court has recognized that "wholly random searches are essential to the effective security of penal institutions." *Hudson v. Palmer*, 468 U.S. 517, 529 (1984).

From these facts, the undersigned concludes that Cantrell's allegations regarding the scope, manner, and justification underlying the searches make it implausible that they were unreasonable. And while Cantrell does not describe where the searches occurred, they would be permissible even if performed in the presence of other inmates.[10] In addition, no facts are alleged that suggest the searches were performed in a "humiliating and degrading manner." *Elliott*, 38 F.3d at 191. Thus, it is implausible that the searches were unreasonable such that they violated Cantrell's Fourth Amendment rights.

---

[10] *See, e.g.*, *Bernhart v. Gusman*, No. CV 15-1800, 2015 WL 9581319, at *14 (E.D. La. Nov. 17, 2015), *report and recommendation adopted,* No. CV 15-1800, 2015 WL 9480453 (E.D. La. Dec. 29, 2015) ("Similarly, the mere possibility that other inmates could have seen [plaintiff] naked in the OPP outdoor recreation area where the subject search occurred . . . does not establish a constitutional violation.").

### 3. *Excessive Bail Claim*

Next, Cantrell alleges that the bail set while he was detained at TGCJ was excessive. Bail is excessive "when set in an amount greater than that required for reasonable assurance of the presence of the defendant." *United States v. McConnell*, 842 F.2d 105, 107 (5th Cir. 1988) (first citing *United States v. Salerno,* 481 U.S. 739 (1987), then citing *Stack v. Boyle,* 342 U.S. 1 (1951)). Bail is not excessive merely because a defendant cannot afford to pay it. *Id.* Setting bail is committed to the discretion of the district court, and is reviewed only for abuse of discretion. *Id.* at 107–08. The Eighth Amendment's prohibition of excessive bail does not confer an obligation to offer bail to pretrial detainees. *United States v. Salerno*, 481 U.S. 739, 752 (1987) ("[The Excessive Bail Clause], of course, says nothing about whether bail shall be available at all.").

Here, Cantrell fails to plausibly allege that the bail set by the magistrate was excessive. He alleges only that the magistrate refused to grant bail for his 2022 Detention. *Id.* at 7. However, discretion to withhold bail does not implicate the Eighth Amendment's prohibition against excessive bail. *Salerno*, 481 U.S. at 752. The undersigned therefore concludes that Cantrell has not plausibly alleged that he was subjected to excessive bail.[11]

### 4. *Involuntary Servitude Claim*

Lastly, Cantrell alleges that he was subjected to involuntary servitude while being held as a pretrial detainee at TGCJ. The Thirteenth Amendment prohibits involuntary

---

[11] Even considering the bail set for his 2020 and 2021 Detentions—which cannot be challenged due to the statute of limitations—Cantrell alleges that he was able to make bail both times. Dkt. No. 1 at 4–6. This alone is sufficient to demonstrate that his bail was not excessive. *Roberts v. City of Booneville, Mississippi*, No. 1:23-CV-00154-GHD-RP, 2024 WL 3035188 (N.D. Miss. June 17, 2024) (citing *Granger v. Slade*, 361 F. Supp. 2d 588, 596–97 (S.D. Miss. 2005)).

servitude, "except as punishment for crime whereof the party shall have been duly convicted." U.S. CONST., Thirteenth Am. § 1. Thus, inmates who have been "tried, convicted, and sentenced in accordance with the law" cannot raise a colorable claim of involuntary servitude. *Ali v. Johnson*, 259 F.3d 317. 318 (5th Cir. 2001) (quoting *Draper v. Rhay,* 315 F.2d 193, 197 (9th Cir. 1963)). However, pretrial detainees who have not been convicted of a crime may be able to assert a claim under the Thirteenth Amendment.

The Fifth Circuit defines involuntary servitude as "an action by the master causing the servant to have, or to believe he has, no way to avoid continued service or confinement." *Brooks v. George Cnty., Miss.*, 84 F.3d 157, 162 (5th Cir. 1996) (citing *Watson v. Graves,* 909 F.2d 1549, 1552 (5th Cir.1990)). Compulsion is a necessary element: "[w]hen the employee has a choice, even though it is a painful one, there is no involuntary servitude[.]" *Id.* For example, pretrial detainees who agree to work as a trusty in exchange for the privilege of leaving jail pending trial are not subject to involuntary servitude; because pretrial confinement is not punishment, the "choice between this confinement and work as a trusty cannot be considered coercive[.]" *Id.* at 162–63.

Even when a court finds that a pretrial detainee was coerced into performing work, the plaintiff's Thirteenth Amendment rights are not violated in two judicially-created exceptions. First, the "civic duty" exception allows the government to compel citizens to perform certain duties, such as jury duty and military service. *Channer v. Hall*, 112 F.3d 214, 218 (5th Cir. 1997). Second, the government may still compel labor under "exceptional cases well established in the common law," such as prohibition of desertion by sailors. *Id.* The Fifth Circuit has interpreted the civic duty exception to permit compelled

28

housekeeping tasks, such as preparing meals and cleaning. *Id.* at 215, 218–19 (holding that detainee's Thirteenth Amendment rights were not violated when forced to work in Food Services Department from 4:30am to 12:30pm daily).

Here, Cantrell has plausibly alleged that he was coerced into performing labor. Cantrell alleges that he was forced to work on kitchen duty and dorm duty for eight hours each day, seven days a week. Dkt. Nos. 1 at 6; 19 at 7. These work assignments began after he was assigned to a new unit following his altercations with the West Texas gang, and he was told the only other available unit was the quarantine unit. Dkt. No. 19 at 7. Thus, Cantrell was presented with, at most, three options: exposure to health risks in the quarantine unit, exposure to risk of harm from inmates in his former unit, or forced servitude in his new unit. Cantrell had a constitutional right to be free from punishment in the form of a substantial risk of harm from disease or inmate violence, and could not be forced to choose between involuntary labor and one of these alternatives. *Hare*, 74 F.3d at 639 (recognizing pretrial detainees' right to "basic needs such as medical care and safety"). This choice—if it was even offered—was coercive.

Nonetheless, Cantrell fails to state a claim under the Thirteenth Amendment because his involuntary labor falls under the civic duty exception. As discussed in *Channer v. Hall*, the government can compel detainees to perform housekeeping tasks, including food preparation and cleaning duties. 112 F.3d at 218–19. This exception applies even when the detainee is legally coerced into performing labor, such as by punishing uncooperative detainees with solitary confinement. *Id.* at 218. Cantrell's labor—service on kitchen duty and dorm duty, Dkt. No. 19 at 6–7—consisted of similar types of housekeeping as those

considered in *Channer*, where the court concluded that the civic duty exception to the Thirteenth Amendment applied.[12] 112 F.3d at 218–19. Thus, the civic duty exception also applies to and defeats Cantrell's Thirteenth Amendment claims here.

Because Cantrell's claims fall under the civic duty exception, the undersigned concludes that it is implausible that Cantrell was subjected to involuntary servitude in violation of the Thirteenth Amendment.

### C. Claims Arising from Prosecution

Cantrell's second series of claims arise from allegations that the defendants violated his constitutional rights when prosecuting him for use of criminal instruments. He claims that DA Palmer committed a *Brady* violation when she failed to disclose knowledge of his background in foster care. He also claims that the defendants engaged in malicious prosecution because they lacked probable cause to prosecute him for use of criminal instruments. He further claims that the defendants violated the Takings Clause by using the data from his cellphone to prosecute him. Lastly, he claims that he was subjected to Double Jeopardy when he was returned to TGCJ following his acquittal.

### 1. Brady *Violation Claim*

First, Cantrell alleges that DA Palmer failed to uphold her obligation under *Brady* to disclose exculpatory evidence. The Supreme Court held in *Brady v. Maryland* that

---

[12] The undersigned notes that the detainee in *Channer* was provided compensation, *Id.* at 219, while Cantrell was not. Dkt. No. 19 at 8. Cantrell highlights this fact, noting that "unpaid labor is slavery." *Id.* at 9. However, compensation is relevant only to the extent it indicates that the detainee agreed to work voluntarily, and it is ultimately *involuntary* servitude rather than *unpaid* labor that the Thirteenth Amendment prohibits. *Channer*, 112 F.3d at 218 n.7. The lack of compensation provides evidence that Cantrell's labor was involuntary, but as discussed above the civic duty exception applies even to involuntary servitude.

prosecutors have a duty to disclose exculpatory evidence to the defense that is material either to guilt or punishment. 373 U.S. 83, 87 (1963). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682 (1985). Prosecutors have an affirmative duty to learn of "favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *see also Strickler v. Greene,* 527 U.S. 263, 280–81 (1999).

A plaintiff may bring a *Brady* claim only if the following elements are met: "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler,* 527 U.S. at 281–82. And "suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial[;]" if a defendant is never tried, convicted, or sentenced, there can be no *Brady* violation. *Bagley*, 473 U.S. at 678 (holding that claimant under *Brady* must establish that suppression of exculpatory evidence "undermines confidence in the outcome of the trial"); *see also Strickler*, 527 U.S. at 281 ("[S]trictly speaking, there is never a real '*Brady* violation' unless . . . there is a reasonable probability that the suppressed evidence would have produced a different verdict.").

Here, Cantrell fails to plausibly allege that the prosecution committed a *Brady* violation. The evidence he alleges was suppressed consists of conversations Westerman had

with Cantrell's foster family and Cantrell himself; these conversations revealed that Cantrell was sexually abused by white officials while in Texas foster care. Dkt. No. 24 at 16–17. Cantrell claims that this evidence is exculpatory because it shows Cantrell was "of no threat and innocent of the alleged crime." *Id.* at 17. Because the entirety of the prosecution's evidence consisted of the contents of Cantrell's phone—which was returned to him before litigation—his *Brady* claim hinges solely on these allegedly suppressed conversations. Dkt. Nos. 1 at 5; 24 at 12–15.

These allegations are insufficient to plausibly allege a *Brady* violation. The undersigned is not persuaded that Cantrell's history in foster care is exculpatory, material, or even relevant. A history of childhood sexual abuse, while undoubtedly tragic, does not provide evidence that the victim does not pose a threat or is innocent of any particular offense in the present. The undersigned also doubts that the evidence of these conversations was suppressed; Westerman told Cantrell about his interviews with Cantrell's foster family, Dkt. No. 1 at 5, and Cantrell obviously knew about the conversations he had with Westerman.[13] But even assuming that these conversations were withheld and contained relevant, material, and exculpatory information, Cantrell was acquitted regardless. Dkt. No. 1 at 8. Because Cantrell was acquitted even without disclosure of this hypothetical evidence, there is no "reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281..

The undersigned therefore concludes that Cantrell has not plausibly alleged that the

---

[13] Cantrell was also well aware of the events discussed in these conversations, as indicated by the notes on his phone relating to his history as a victim of sexual abuse in foster care. Dkt. No. 24 at 15.

prosecution failed to uphold their duty under *Brady*.

### 2. *Malicious Prosecution Claim*

Next, Cantrell alleges that the defendants subjected him to an unlawful violation of the Fourth Amendment by maliciously prosecuting him. A plaintiff may bring a malicious prosecution claim against arresting officers if he is unreasonably seized pursuant to legal process. *Thompson v. Clark*, 596 U.S. 36, 42 (2022). In the Fifth Circuit, this requires the plaintiff to prove six elements: "(1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) malice; and (6) damages." *Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023) (citing *Gordy v. Burns*, 294 F.3d 722, 727 (5th Cir. 2002)). The plaintiff must also demonstrate the "threshold element of an unlawful Fourth Amendment seizure." *Id.*; *see also Id.* at 279 n.2 ("[I]f the prosecution is supported by probable cause on at least one charge, then a malicious prosecution claim cannot move forward.").

Here, Cantrell's malicious prosecution claim fails because he does not plausibly allege this "threshold element." As discussed above, the defendants had probable cause to at minimum arrest Cantrell for speeding on May 2, 2020. His subsequent detentions and criminal prosecution were only for the criminal instruments charge; thus, the sole issue is whether probable cause existed to prosecute Cantrell for this offense.

Under Texas law, a defendant commits the offense of unlawful use of criminal instrument if they are in possession of a criminal instrument with intent to use it to commit

an offense. TEX. PENAL CODE § 16.01(a)(1). In turn, a "criminal instrument" is defined as anything that is not otherwise unlawful to possess, manufacture, or sell, that is "specially designed, made, or adapted for use in the commission of an offense." § 16.01(b)(1). Items that could be used to commit a crime but also have lawful uses are not criminal instruments. *Eodice v. State*, 742 S.W.2d 844, 847 (Tex. App. 1987) (finding that a "flashlight, pry bar, circuit tester, cotter pin, and feeler gauge" were not criminal instruments, despite being intended for use in a burglary, because they were "ordinary, commonly available tools").

Here, most of the items the officers found in Cantrell's bag could not reasonably be considered criminal instruments. While a gas can, matches, hammer, and dark clothing could be used for arson, they are also commonly available items that have lawful uses. Dkt. Nos. 1 at 3; 18 at 4. However, the assessment is more complicated for the glass bottles and paper towels. These items are also common objects with lawful uses, but the authenticated arrest report indicates that they were not stored separately; instead, the paper towels were inserted into the necks of the bottles. If the bottles were stored as Molotov cocktails during transit, they could be said to be "adapted for use in the commission of an offense," and thus qualify as a criminal instrument. TEX. PENAL CODE § 16.01(b)(1).

This description aligns with Cantrell's description of the articles, as he notes that the bottles seen in his music videos were "fashioned as mere prop molotov cocktails." Dkt. No. 24 at 8. This makes it likely that the bottles were stored and transported in this form as well, and were found in this condition during Westerman's search. Westerman was not required to disregard the Molotovs merely because Cantrell claimed they were props. *D.C. v. Wesby*, 583 U.S. 48, 60–61 (2018) (holding that an officer is not required to disregard a

34

circumstance when evaluating probable cause merely because suspect offers an innocent explanation). The undersigned therefore finds it implausible that the defendants lacked probable cause to prosecute Cantrell for use of criminal instruments.

### 3. *Takings Clause*

Next, Cantrell alleges that the defendants violated the Takings Clause of the Fifth Amendment by using data from his phone in his criminal prosecution. The Takings Clause prohibits the government from seizing private property for public use without just compensation. U.S. CONST. amend. V. The Takings Clause does not apply to property seized and retained for use in a criminal prosecution; the power to seize property as evidence arises from the government's police power, and "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." *AmeriSource Corp. v. United States,* 525 F.3d 1149, 1153–54 (Fed.Cir. 2008); *Rhaburn v. United States*, 88 Fed. Cl. 310, 313 (2009), *aff'd,* 390 F. App'x 987 (Fed. Cir. 2010).

Here, Cantrell fails to plausibly allege that the defendants violated the Takings Clause. His phone and the data stored on it may have been property taken without compensation, but they were not taken for a *public use*; it was instead taken pursuant to the police power, which is not a public use. *AmeriSource Corp.,* 525 F.3d at 153–54. Thus, the seizure falls outside of the Fifth Amendment's Takings Clause. The undersigned concludes that Cantrell has failed to plausibly allege a violation of the Takings Clause.

### 4. *Double Jeopardy Claim*

Lastly, Cantrell alleges that the defendants subjected him to double jeopardy even after he was acquitted of his criminal instruments charge. The Fifth Amendment's Double

Jeopardy clause—applicable to the states through the Fourteenth Amendment—protects defendants from a second prosecution for the same offense. *Currier v. Virginia*, 585 U.S. 493, 498 (2018); *United States v. Jones*, 733 F.3d 574, 580 (5th Cir. 2013). The constitutional guarantee "recognizes the vast power of the sovereign, the ordeal of a criminal trial, and the injustice our criminal justice system would invite if prosecutors could treat trials as dress rehearsals until they secure the convictions they seek." *Currier v. Virginia*, 585 U.S. 493, 498 (2018). But when such oppressive practices are not present, the clause should not pose "an insuperable obstacle to the administration of justice." *Id.* (quoting *Wade v. Hunter,* 336 U.S. 684, 688–689 (1949)).

Here, Cantrell fails to plausibly allege that he was subjected to double jeopardy because he was prosecuted only once, not twice. Cantrell was acquitted on April 19, 2022, and released from TGCJ custody within hours. Dkt. No. 24 at 17–19. Cantrell does not allege that he has been prosecuted for use of criminal instruments since his acquittal. Instead, he alleges that the defendants subjected him to double jeopardy by handcuffing him, returning him to TGCJ, and then releasing him three hours later. *Id.* at 18–19. This inconvenience does not implicate concerns surrounding the "ordeal of a criminal trial" or "dress rehearsal" prosecutions. *Currier*, 585 U.S. at 498. And it appears obvious to the undersigned that proper release of an acquitted defendant requires some procedural formalities; a three-hour delay between acquittal and release is not unreasonable given this concession.

For these reasons, the undersigned concludes that Cantrell has not plausibly alleged that the defendants subjected him to double jeopardy in violation of the Fifth Amendment.

36

## VI. LEAVE TO AMEND

Still, there is the issue of whether the Court must give Cantrell leave to amend his complaint. Generally, "a *pro se* litigant should be offered an opportunity to amend his complaint before it is dismissed." *Brewster v. Dretke*, 587 F.3d 764, 767–68 (5th Cir. 2009). Leave to amend is not required, however, where an amendment would be futile, in other words, the amended complaint would still fail to state a claim, *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014), or where a plaintiff has already received an opportunity to amend his or her claims, *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 556 (5th Cir. 2007).

Here, the undersigned concludes that Cantrell has pled his best case. He has been given two opportunities to supplement his pleadings through his Questionnaire Responses. Dkt. Nos. 18–19, 24. His Complaint and Responses both contain sufficient factual detail to adequately screen his claims. Where his claims are time-barred, further amendment would be futile because he has repeatedly confirmed the dates when his claims accrued. His remaining claims fail not for lack of detail, but because the facts alleged do not plausibly support his claims. The undersigned finds no reason to further delay this civil action, which was filed in late 2023 and has been in judicial screening for more than two years. Dkt. No. 1. The undersigned therefore concludes that leave to further amend would be futile.

## VII. CONCLUSION

For the reasons above, the undersigned RECOMMENDS that Cantrell's claims against all defendants be DISMISSED with prejudice as time-barred and for failure to state a claim.

## VIII.  RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## IX. TRANSFER OF CASE

Having completed the preliminary screening of Cantrell's claims, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the United States District Judge and designated as Civil Action No. 6:23-CV-00055-H.

ORDERED this 24th day of March 2026.

_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE

38